Christin Cho (Cal. Bar No. 238173)
christin@dovel.com
Simon Franzini (Cal. Bar No. 287631)
simon@dovel.com
Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLYN NORRIS and A.J. STONE, individually and on behalf of all others similarly situated,<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>SAMSUNG ELECTRONICS AMERICA, INC.,<br><br>　　　*Defendant*. | Case No. 5:23-cv-01496<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

# Table of Contents

I.   Introduction. ............................................................................................. 1

II.  Parties. ...................................................................................................... 2

III. Jurisdiction and Venue. ............................................................................ 2

IV.  Facts. ......................................................................................................... 3

   A.   Gas stoves and cooktops produce health-harming pollutants ........... 4

   B.   Defendant knows of this pollutant risk. ........................................... 7

   C.   Safe alternative designs that would reduce the danger are available. ........... 10

   D.   Defendant should have warned of the pollutant risk. .................... 10

   E.   Defendant overcharges millions of consumers. ............................. 13

   F.   Plaintiffs were misled and harmed by Defendant. ........................ 13

   G.   No adequate remedy at law. .......................................................... 18

V.   Class Action Allegations .......................................................................... 18

VI.  Claims. ....................................................................................................... 21

   Count I: Violation of California's Unfair Competition Law ..................... 21

   Count II: Violation of California's False Advertising Law (FAL) ........... 23

   Count III: Violation of California's Consumer Legal Remedies Act (CLRA) ... 24

   Count IV: Breach of Implied Warranty .................................................... 26

   Pursuant to Song-Beverly Consumer Warranty Act.................................. 26

   Count V: Violations of State Consumer Protection Statutes ..................... 27

   Count VI: Breach of Implied Warranties ................................................... 29

   Count VII: Fraudulent Omission ............................................................... 31

   Count VIII: Unjust Enrichment / Quasi-contract ...................................... 32

VII. Jury Demand ............................................................................................. 33

VIII. Prayer for Relief. ..................................................................................... 33

i

## I.     Introduction.

1.     About 40% of American households use natural gas for cooking. Many households use the appliance daily to cook in the home.  Recent studies confirm however, that gas cooking has important risks.  Gas stoves "emit air pollutants… at levels the EPA and World Health Organization have said are unsafe and linked to respiratory illness, cardiovascular problems, cancer, and other health conditions."[1]  For example, gas stoves and cooktops emit nitrogen oxides, which are "gases [that] can worsen asthma and other lung diseases."[2] This is true for all consumers, adults and children alike, but is especially risky for children. *Id.*  Children living in households that use gas cooking are "42% more likely to have asthma."[3]

2.     This risk is avoidable; manufacturers can reasonably design gas stoves and cooktops to mitigate the risk of pollutants.  Manufacturers also can—and should—disclose the risk of pollutants to consumers, who can then make an informed choice about whether to buy a gas appliance or an electric appliance (which does not carry the same risk).

3.     Defendant Samsung Electronics America, Inc. makes, sells, and markets household appliances, including Samsung brand gas stoves and cooktops. Plaintiffs purchased gas stoves and cooktops made by Defendant.  Plaintiffs believed that the products were free from defects, and they did not know that gas cooking has significant pollutant risks. Had they known of the risks of pollutants from the gas stove and cooktop, they would not have purchased it.

4.     Plaintiffs bring this case for themselves and for other consumers who purchased Defendant's gas stoves, cooktops, ovens, and range products.

---

[1] https://www.bloomberg.com/news/articles/2023-01-09/us-safety-agency-to-consider-ban-on-gas-stoves-amid-health-fears

[2] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/

[3] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

## II.    Parties.

5.    Plaintiff Ellyn Norris is domiciled in San Marcos, California.

6.    Plaintiff A.J. Stone is domiciled in Indio, California.

7.    The proposed class and subclasses (identified below) includes citizens of all states.

8.    Defendant Samsung Electronics America, Inc. is a New York corporation with a principal place of business in Ridgefield Park, New Jersey.

9.    Defendant makes, distributes, sells, and markets gas stoves, cooktops, ovens, and range products (including under the brand names Samsung and Dacor), and has done so throughout any applicable statute of limitations period.

## III.    Jurisdiction and Venue.

10.    This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from the Defendant.

11.    This Court has personal jurisdiction over Defendant. Defendant does business in California.  It advertises and sells its Products in California, and serves a market for its Products in California. Due to Defendant's actions, its Products have been marketed and sold to consumers in California, and harmed consumers in California. Plaintiffs' claims arise out of Defendant's contacts with this forum. Due to Defendant's actions, Plaintiffs purchased Defendant's Products in California, and were harmed in California.

12.    Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d). Defendant would be subject to personal jurisdiction in this District if this District were a separate state. Defendant advertises and sells its Products to customers in this District, serves a market for its Products in this District, and Plaintiffs' claims arise out of Defendant's contacts in this forum. Venue is also proper under 28 U.S.C. § 1391(b)(2)

1    because a substantial part of the events giving rise to the claims occurred here.

2    **IV.    Facts.**

3        13.    About 40% of American households use natural gas for cooking.[4] Many

4    households use the appliance daily to cook in the home.

5        14.    Defendant makes, markets, and sells residential gas stoves, gas ranges, gas

6    cooktops and gas ovens ("Defendant's Products" or "Products"), including under brand

7    names such as Samsung and Dacor.  Some examples of Defendant's Products are shown

8    below:[5]





    [4] https://www.washingtonpost.com/business/energy/biden-isnt-coming-for-your-gas-stove-states-are/2023/01/13/12353d1e-9353-11ed-90f8-53661ac5d9b9_story.html

    [5] https://www.samsung.com/us/home-appliances/ranges/gas/

15.     Defendant sells its products specifically for home use, and markets to consumers for home use.  In fact, the only intended use for Defendant's Products is for cooking inside the home.

**A.     Gas stoves and cooktops produce health-harming pollutants.**

16.     Recent studies have confirmed that gas stoves and cooktops harm the health of the households that use them.[6]  Gas stoves and cooktops "emit air pollutants such as nitrogen dioxide, carbon monoxide and fine particulate matter at levels the EPA and World Health Organization have said are unsafe and linked to respiratory illness, cardiovascular problems, cancer, and other health conditions."[7]

17.     This emission of harmful pollutants occurs because when gas stoves and cooktops are turned on, natural gas combines with oxygen to create a controlled flame for cooking and produces gases like nitric oxide and nitrogen dioxide as a byproduct of the combustion.[8]  All of Defendant's Products emit gases this way when they are used for cooking, because they all use natural gas to create heat for cooking.  In particular, nitrogen oxides (sometimes written as NOx or NO2),[9] are hazardous to human health. "A recent study published by researchers at Stanford calculated that emission of nitrogen dioxide from certain gas burners or ovens rose above the standard set for outdoors by the Environmental Protection Agency (EPA) within a few minutes."[10]

18.     Further, "recent EPA research also linked long-term NO2 exposure to cardiovascular effects, diabetes, poorer birth outcomes, premature mortality, and

---

[6] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/

[7] https://www.bloomberg.com/news/articles/2023-01-09/us-safety-agency-to-consider-ban-on-gas-stoves-amid-health-fears

[8] https://www.theguardian.com/environment/2023/jan/15/gas-stoves-pollution-alternatives

[9] The term NOx is a common term for nitrogen oxides that include nitric oxide (NO) and nitrogen dioxide (NO2). https://www.encyclopedia.com/earth-and-environment/ecology-and-environmentalism/environmental-studies/nox-nitrogen-oxides

[10] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

4

cancer."[11] It is also linked to "reduced cognitive performance, especially in children." *Id.* "[E]arly-life exposure to air pollution from indoor gas appliances may be negatively associated with neuropsychological development through the first 4 years of life, particularly among genetically susceptible children." *Id.* "The gases can worsen asthma and other lung diseases."[12] "In short, research shows that even low levels of NO2 exposure are dangerous, especially to the vulnerable."[13]

19.    "Yet…homes with gas stoves have around 50 percent, ranging up to over 400 percent, higher levels of NO2 than homes with electric stoves."[14] Concentrations of NO2 emissions from gas cooking can exceed US outdoor pollution standards several times over when conducting common cooking tasks like boiling water, baking a cake, roasting meat, and frying bacon with gas. *Id.*   Thus, children living in households with gas stoves are "42% more likely to have asthma."[15]  A recent study "found that 12.7%…of current childhood asthma in the US is attributable to gas stove use."[16] This is a level that is "similar to the childhood asthma burden attributed to secondhand smoke exposure."[17] Data shows that, "the higher the nitrogen dioxide level, the more severe the asthma symptoms in children and adults."[18]

20.    In addition, cooking with gas stoves while windows are closed exacerbates the hazard of exposure to NO2.  A study found that while cooking with gas stoves

---

[11] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks

[12] https://www.consumerreports.org/appliances/indoor-air-quality/is-your-gas-range-a-health-risk-a6971504915/

[13] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks

[14] https://www.vox.com/energy-and-environment/2020/5/7/21247602/gas-stove-cooking-indoor-air-pollution-health-risks

[15] https://www.health.harvard.edu/blog/have-a-gas-stove-how-to-reduce-pollution-that-may-harm-health-202209072811

[16] IJERPH | Free Full-Text | Population Attributable Fraction of Gas Stoves and Childhood Asthma in the United States (mdpi.com)

[17] IJERPH | Free Full-Text | Population Attributable Fraction of Gas Stoves and Childhood Asthma in the United States (mdpi.com)

[18] Have a gas stove? How to reduce pollution that may harm health - Harvard Health

increases NO2 concentrations in the home, and that this NO2 exposure is associated with increased nighttime inhaler use in children with asthma, cooking with a gas stove "while windows are closed is associated with even higher 24-hour NO2 concentrations."[19] Using gas stoves without a vent also increases NO2 exposure.  A study found that "gas can pose some risk of respiratory illness *particularly* where ventilation is inadequate and/or equipment is poorly made or maintained… Unvented gas appliances, including stoves and ovens, can give rise to substantial quantities of NO2, ultrafine particles and CO."[20]  The World Health Organization Guidelines for Indoor Air Quality stated, "[t]he average nitrogen dioxide concentration over a period of several days may exceed 150 µg/m3 when unvented gas stoves are used."[21]

21.   Using gas stoves for longer periods also increases NO2 exposure.  A study found that "each hour of cooking appliance use was associated with an 18ppb increase in 24-hour NO2 concentration, and in the cold season, each hour of cooking appliance use increased 24-hour NO2 concentration by 25ppb."[22]  Spending many hours in a

---

[19] Paulin, L. M., Williams, D. L., Peng, R., Diette, G. B., McCormack, M. C., Breysse, P., & Hansel, N. N. (2017). 24-h Nitrogen dioxide concentration is associated with cooking behaviors and an increase in rescue medication use in children with asthma. Environmental research, 159, 118–123. https://doi.org/10.1016/j.envres.2017.07.052

[20] Nigel Bruce and Kirk R Smith, WHO IAQ guidelines: household fuel combustion – Review 4: health effects of household air pollution (HAP), 2014, https://cdn.who.int/media/docs/default-source/air-pollution-documents/air-quality-and-health/who-iaq-guidelines-household-fuel-review_4.pdf (emphasis added); Koo LC, Ho JHC, Ho CY, Matsuki H, Shimizu H, Mori T, et al. Personal exposure to nitrogen dioxide and its association with respiratory illness in Hong-Kong. American Review of Respiratory Disease. 1990;141(5):1119-26; B. Seals & A. Krasner, Health Effects from Gas Stove Pollution, Rocky Mountain Institute et. al (2020) (RMI Report) (citing Integrated Science Assessment (ISA) For Oxides of Nitrogen – Health Criteria (Final Report, 2016).

[21] https://www.ncbi.nlm.nih.gov/books/NBK138707/ (citing Pilotto LS, Douglas RM, Attewell RG, Wilson SR. Respiratory effects associated with indoor nitrogen dioxide exposure in children. Int J Epidemiol. 1997 Aug;26(4):788-96. doi: 10.1093/ije/26.4.788. PMID: 9279611).

[22] Paulin, L. M., Williams, D. L., Peng, R., Diette, G. B., McCormack, M. C., Breysse, P., & Hansel, N. N. (2017). 24-h Nitrogen dioxide concentration is associated with cooking behaviors and an increase in rescue medication use in children with asthma. Environmental research, 159, 118–123. https://doi.org/10.1016/j.envres.2017.07.052

home where gas stoves are used, such as 13 hours a day, also increases NO2 exposure.[23] For example, a study found that "because preschool children spend much of their time in the home, they may be especially at risk of the adverse effects of indoor NO2 exposure."[24]

22.     For these reasons, the American Medical Association recently adopted a resolution "recogniz[ing] the association between the use of gas stoves, indoor nitrogen dioxide levels and asthma," and committed to informing "members and, to the extent possible, health care providers, the public, and relevant organizations that use of a gas stove increases household air pollution and the risk of childhood asthma and asthma severity."[25]

**B.     Defendant knows of this pollutant risk.**

23.     Defendant is aware that its Products emit health-harming pollutants.

24.     Since the 1980s, the natural gas industry—of which Defendant is a constituent—has worried that the US Consumer Product Safety Commission would regulate gas cooking emissions due to indoor air quality concerns.[26]

25.     This is because "[s]cientists have long known that gas stoves emit pollutants that irritate human airways and can cause or exacerbate respiratory problems."[27] "[S]tudies dating back decades have shown harmful effects from the NO2 in gas cooking stoves."[28]

---

[23] Hansel NN, Breysse PN, McCormack MC, Matsui EC, Curtin-Brosnan J, Williams DL, Moore JL, Cuhran JL, Diette GB. A longitudinal study of indoor nitrogen dioxide levels and respiratory symptoms in inner-city children with asthma. Environ Health Perspect. 2008 Oct;116(10):1428-32. doi: 10.1289/ehp.11349. Epub 2008 Jul 23. PMID: 18941590; PMCID: PMC2569107

[24] *Id.*

[25] https://policysearch.ama-assn.org/policyfinder/detail/gas%20stove?uri=%2FAMADoc%2Fdirectives.xml-D-135.964.xml; https://publicinterestnetwork.org/updates/update-ama-moves-forward-resolution-gas-stove-pollution/

[26] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-solution-theyre-just-not-using-it; https://www.sciencenews.org/archive/cleaner-cooking-gas

[27] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/

[28] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/

26.     In 1986, a report by the Clean Air Scientific Advisory Committee of the U.S. Environmental Protection Agency stated, "Health effects data from epidemiological studies in gas stove homes suggest that young children are at increased risk of respiratory symptom; and infection from exposures to elevated concentrations of N02. Other groups at risk to N02 exposures are asthmatics and bronchitics."[29] It further warned, "Human epidemiologic studies suggest that exposure to nitrogen dioxide may lead to increased respiratory illness rates among children." *Id.* at 6.

27.     Subsequent studies have confirmed the harmful effects of pollutants from gas stoves. "In a 1992 meta-analysis of studies on this topic, scientists at the EPA and Duke University found that nitrogen dioxide exposure that is comparable to that from a gas stove increases the odds of children developing a respiratory illness by about 20 percent."[30] "A 2013 meta-analysis of 41 studies found that gas cooking increases the risk of asthma in children and that NO2 exposure is linked with currently having a wheeze." *Id.* And "[m]ost recently, a study published last December found that 12.7 percent of childhood asthma cases in the U.S. can be attributed to gas stove use." *Id.*

28.     Like other makers of gas appliances, Defendant monitors and keeps track of research on the health effects of its products. This is diligence that large companies like Defendant routinely do when selling a consumer product. Defendant also monitors and keeps track of research on the gas appliances' emissions of pollutants at a health-harming level as part of its risk management process. Defendant is owned and controlled by Samsung Electronics Co., Ltd, which operates globally.[31] Samsung Electronics has a "company-wide risk management process" that analyzes "risk factors includ[ing] global and regional regulations… that could impact our business and brand

---

[29] Report of the Clean Air Scientific Advisory Committee, May 9, 1986, at 5.
[30] https://www.scientificamerican.com/article/the-health-risks-of-gas-stoves-explained/
[31] https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2022_con_quarter04_all_1.pdf (Samsung Electronics Co., Ltd. is the controlling company for Samsung Electronics America.").

8

reputation."[32]

29.    Through this risk management process, Defendant and its controlling company Samsung Electronics would have been aware of the potential and actual regulations of gas stoves and cooktops due to the emissions of pollutants at a health-harming level.  For example, the EU Gas Appliances Regulation adopted on March 9, 2016, stated that gas appliances "shall be so designed and constructed that, when normally used, they do not cause a concentration of carbon monoxide or other substances harmful to health, such as they would be likely to present a danger to the health of persons and domestic animals exposed."[33]  As Samsung states, it is a "premium home appliance brand in Europe"[34] and has many European subsidiaries.[35]  So Samsung would have been aware of this regulation through its risk management process, because the regulation affects Samsung's home appliance business and brand reputation in Europe.  And Samsung would be worried that the same gas appliance health hazard would lead to similar regulations elsewhere, including the United States.  Defendant and its controlling company are aware that regulations in the US are a risk, because US agencies have indicated interest in regulating gas appliances indoor air quality concerns as early as 1983.[36]  To identify, assess, review, and respond to these regulatory risks, as part of its risk management process, Defendant tracked research on the gas appliances' emissions of health-harming pollutants.  Defendant is aware of the fact that its Products emit harmful pollutants at a health-harming level.  It is further aware that cooking with

---

[32] https://image-us.samsung.com/SamsungUS/home/pdf/Samsung-Electronics-Sustainability-Report-2021.pdf; *see* https://images.samsung.com/is/content/samsung/assets/global/ir/docs/sustainability_report_2023_en-1.pdf at 124 ("Samsung Electronics monitors the risks arising from its global operations in accordance with risk management processes and manuals in each field, including environmental safety, climate change and energy, and compliance.").
[33] https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32016R0426
[34] https://news.samsung.com/medialibrary/global/photo/15005?album=31
[35] https://images.samsung.com/is/content/samsung/assets/global/ir/docs/2022_con_quarter04_all_1.pdf at 18-20 (listing all European subsidiaries).
[36] https://www.vox.com/policy-and-politics/23550747/gas-stove-health-concerns-new-history.

1    gas increases the rates of respiratory illness in adults and children.

2         **C.    Safe alternative designs that would reduce the danger are available.**

3         30.    Further, the harms could have been avoided through safe, reasonable

4    alternative designs.  Alternative gas stove and cooktop designs that "reduce harmful

5    emissions, without sacrificing heat, have been available for decades."[37]  As one example,

6    the "jet-powered infrared gas-range burner," developed in the 1980s, "consumed about

7    40% less natural gas to reach cooking temperatures and emitted 40% less nitrogen

8    oxides."[38] Another design proposed in the 1980s was the use of a flame insert, which

9    cuts the NOx emissions "more than 40 percent" when the burner is turned on high, and

10   even more at low burner settings.[39]

11        31.    Despite this, Defendant failed to use an alternative design to avoid these

12   harms and reduce harmful pollutants from gas stoves and cooktops.

13        **D.    Defendant should have warned of the pollutant risk.**

14        32.    While Defendant is aware of the harmful health effects of gas cooking,

15   everyday consumers are unaware of these risks.  Consumers shopping for a new

16   cooktop, oven, range, or stove have very little information about the health risks of gas

17   appliances.

18        33.    Consumers remain unaware because nothing on Defendant's packaging,

19   instructions, or warning labels suggest that the gas appliances regularly emit pollutants

20   that are harmful to human health. Further, the labels and warnings do not mention any

21   risk of nitrogen oxides.

22        34.    Defendant sold its Products for cooking inside the home, while omitting

23   any warning of the serious defect due to the harmful emissions.  Defendant knew of the

24   defect, but actively concealed it.  Defendant should have, but did not, warn consumers

---

26   [37] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-
     solution-theyre-just-not-using-it
27   [38] https://www.npr.org/2023/02/04/1149736969/gas-stove-makers-have-a-pollution-
     solution-theyre-just-not-using-it
28   [39] https://www.sciencenews.org/archive/cleaner-cooking-gas

of the fact that its Products emit harmful pollutants when used for cooking.  Defendant should have, but did not, warn consumers of the risk of nitrogen oxides. These warnings could have been included on the packaging, stickers, or instruction manual for the product.  But Defendant did not include any such warning.

35.    Defendant had a duty to warn of the defect.  The defect was an unreasonable safety hazard.  Defendant could have avoided this risk by using available design-arounds.  In addition, the defect was central to the gas appliance's function (i.e., its safety for use cooking inside the home).  Defendant had exclusive knowledge of the defect (which is unknown to everyday consumers), and Defendant actively concealed the defect from consumers by failing to disclose it.  Defendant also made partial representations that are misleading because other material facts were not disclosed.  For example, Defendant warned of some risks of the Products in the user guide for its gas ranges such as the risks of fire and tipping:

**WARNING**: If the information in this manual is not followed exactly, a fire or explosion may result causing property damage, personal injury, or death.

- DO NOT store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.
- WHAT TO DO IF YOU SMELL GAS:
  - DO NOT try to light any appliance.
  - DO NOT touch any electrical switch.
  - DO NOT use any phone in your building.
  - Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions.
  - If you cannot reach your gas supplier, call the fire department.
- Installation and service must be performed by a qualified installer, service agency, or the gas supplier.

## ANTI-TIP DEVICE

⚠ **WARNING**: To reduce the risk of tipping the range, the range must be secured by a properly installed Anti-Tip device. **AFTER THE RANGE HAS BEEN INSTALLED, CONFIRM THAT THE ANTI-TIP DEVICE HAS BEEN PROPERLY INSTALLED AND VERIFY THAT THE ANTI-TIP DEVICE IS PROPERLY ENGAGED.** Refer to the installation manual for instructions.

a) If the Anti-Tip device is not installed, a child or adult can tip the range and be killed.

b) Verify the Anti-Tip device has been properly installed and engaged at right rear (or left rear) of the range bottom.

c) If you move the range and then move it back into place, ensure the Anti-Tip device is re-engaged at the right or left rear of the range bottom.

d) Do not operate the range without the Anti-Tip device in place and engaged.

e) Failure to do so can result in death or serious burns to children or adults.

 ⚠ **WARNING**

**Do not step, lean, or sit on the oven door of the range.** You can cause the range to tip, resulting in burns or serious injuries.

Confirm that the Anti-Tip device is installed properly. Then, to verify that the Anti-Tip device is engaged, grasp the top rear edge of the range and carefully attempt to tilt it forward. The Anti-Tip device should prevent the range from tilting forward more than a few inches.

If you pull the range out from the wall for any reason, make sure the anti-tip device is properly engaged when you push the range back against the wall. If it is not, there is a risk of the range tipping over and causing injury if you or a child stand, sit, or lean on an open door.

Never completely remove the leveling legs. If you remove the leveling legs, the range will not be secured by the anti-tip device properly.

11

Ex. 1 (Samsung user manual for gas ranges) at 2.

36.     But Defendant failed to warn that the Products emit harmful pollutants like nitrogen dioxide.   This led consumers to believe that there was no such risk.  Defendant provides a similar user guide for all its Samsung gas appliances, including for the models that Mr. Stone and Ms. Norris bought.

37.     So Defendant made the same partial representation for all Products.

38.     Defendant also affirmatively represented that the Products were safe and fit for ordinary home cooking by selling the Products for home use and marketing them as for the "home."  On the online product page for Defendant's Products, Defendant offers "contact-free delivery to your home," "[f]ree returns for up to 15 days after your new appliance has been delivered to your home."[40]  Defendant sells its Products on its website under the "Home Appliances" category and invites customers to "[s]hop our top innovative home appliances."[41] Defendant represents that it has "thousands of engineers and service providers ready to help and make sure all the details in your home are in tip-top shape."[42]  In the user manual that Defendant provides with its gas ranges, Defendant states that the "Samsung gas oven range combines all the benefits of 3 separate *home* appliances – a gas range, a gas oven, and a storage drawer."[43]  The manual also clarifies that "[t]his range is for indoor, household use only."[44] Defendant passed this affirmative representation off as the whole truth, while omitting any disclosure of the pollution health hazard.  Indeed, the representation that the products are safe and fit for ordinary home cooking would lead reasonable consumers to believe that there was no significant, health-harming pollutant risk from using the stove for ordinary home cooking.

39.     Defendant's continued sale of the Products, without providing warnings

---

[40] https://samsung.com/us/home-appliances/ranges/gas/6-0-cu-ft-front-control-slide-in-gas-range-in-black-stainless-steel-nx60t8111sg-aa/; https://www.samsung.com/us/home-appliances/ranges/gas/.

[41] https://www.samsung.com/us/home-appliances/ranges/gas/

[42] https://www.samsung.com/us/home-appliances/

[43] Ex. 1, Samsung user manual at 5.

[44] Ex. 1, Samsung user manual at 10.

about the emissions of harmful pollutants, is not the result of accident or coincidence. Defendant has known of the risk of harmful emissions for years, if not decades. And Defendant has shown that it is able and willing to provide warnings about risks associated with the Products—such as fire and tipping risks. Defendant had ample opportunity to include a warning about the harmful emissions with its gas stoves and cooktops. So, Defendant's continued sale of its Products, without warning, is the result of a decision committed, authorized, or ratified by Defendant's executives or directors.

**E.      Defendant overcharges millions of consumers.**

40.    If Defendant disclosed the truth— that is, that its Products emit harmful pollutants, the price of its Products would fall dramatically.

41.    For example, a recent study showed that consumer demand for gas stoves falls as consumers become informed of the harms of gas stoves. Forty-six percent of gas-stove owning adults were interested in replacing their gas stoves after being informed of the study showing the link between gas stove pollution and childhood asthma.[45]

42.    If consumers knew the truth, demand for Defendant's prices would drop, and Defendant could not sell its Products at current prices.

43.    In addition, the defective design of gas stoves and cooktops reduces their value. Consumers pay for an appliance that is safe for home cooking, but receive a less valuable appliance—one with a defective design that carries significant (and undisclosed) air pollution risks.

**F.      Plaintiffs were misled and harmed by Defendant.**

44.    In or around December 2020, Ms. Norris purchased a Samsung gas cooktop from Best Buy while living in San Marcos, California. The cooktop had the model number of NA30N7755TS/AA.[46]

---

[45] https://morningconsult.com/2023/01/31/natural-gas-stove-bans-remain-divisive/
[46] https://www.samsung.com/us/home-appliances/cooktops-and-hoods/gas-cooktops/30-gas-cooktop-with-22k-btu-true-dual-power-burner-2018-na30n7755ts-aa/



45.      In January 2020, Mr. Stone bought a Samsung gas range from Lowe's in La Quinta, California.  The range had the model number NX58K9500WG.[47]

---

[47] https://www.samsung.com/us/home-appliances/ranges/gas/nx58k9500wg-slide-in-gas-range-with-true-convection-nx58k9500wg-aa/

14

46.     Defendant provided the Products to retailers such as Best Buy and Lowe's, with the intention that the ultimate purchasers of the Products would be consumers like Plaintiffs who use the Products at home.  Defendant sells its Products on its website under the "Home Appliances" category and invites customers to "[s]hop our top innovative home appliances."[48]  Defendant's user manual clarifies that "[t]his range is for indoor, household use only."[49]  The manual also directly addresses purchasers who use the Products at home.  The manual instructs the home user on "what to do if *you* smell gas," including: "DO NOT use any phone in *your* building."[50]  Defendant also makes these same representations through retailers such as Best Buy.  The online product page for Defendant's cooktop on Best Buy provides links to resources "From the Manufacturer," including Defendant's user manual.[51]

47.     In purchasing the item, Ms. Norris relied on the representations on the marketing materials and list of features when looking at models at Best Buy with a representative.  And once the cooktop was installed, the Best Buy representative went over general instructions of the manual with her. The marketing materials and manual did not disclose or warn that the product emitted harmful pollutants, such as nitrogen oxides, or disclose the risks of these pollutants. Thus, at the time of purchase, Ms. Norris was unaware that the product emitted harmful pollutants such as nitrogen oxide.

48.     Ms. Norris used the gas cooktop for regular cooking in the home.  She used the gas cooktop approximately 2 times a day for common cooking tasks such as cooking eggs.  This exposed her to a health-harming concentration of pollutants, especially nitrogen dioxide.  In addition, she was exposed to an even higher concentration of indoor pollutants because she used the gas cooktop for extended periods of time to make homemade jam, occasionally for two to three hours per batch.

---

[48] https://www.samsung.com/us/home-appliances/ranges/gas/
[49] Ex. 1, Samsung user manual at 10.
[50] Ex. 1, Samsung user manual at 2 (emphasis added).
[51] https://www.bestbuy.com/site/samsung-30-built-in-gas-cooktop-with-wifi-and-dual-power-brass-burner-stainless-steel/6261814.p?skuId=6261814

49.     Ms. Norris did not discover the truth until summer of 2023, when she saw a class action advertisement regarding the risks of harmful pollutants from gas appliances.  Ms. Norris could not have made the discovery earlier despite reasonable diligence.  Reasonable consumers do not conduct independent research on potential defects of consumer products.  Ms. Norris did not regularly read sources that would have shown the gas appliances' emissions defect earlier, such as epidemiology journals or World Health Organization guidelines. Instead, it was only after there was widespread media coverage of the issue, that Ms. Norris discovered the truth.  Prior to this date, Ms. Norris was unaware of the defect and these risks.  Before this, Ms. Norris had no reason to search for information on a defect that she did not know about.

50.     In purchasing the item, Mr. Stone relied on the representations on the marketing materials and the model stove he viewed at Lowe's.  Mr. Stone understood from these sources that the stove was for home use.  Once he received the stove, Mr. Stone looked at the manual that came with it.  The online marketing materials, and manual did not disclose or warn that the product emitted harmful pollutants, such as nitrogen oxides, or disclose the risks of these pollutants. Thus, at the time of purchase, Mr. Stone was unaware that the product emitted harmful pollutants such as nitrogen oxide.

51.     Mr. Stone used the gas stove for regular cooking in the home.  Before he was aware of the risks from pollutants, Mr. Stone used the gas stove approximately five times a week, to cook for breakfast, lunch, and dinner.  On average, he used the gas stove approximately one hour each time.  He used the gas stove for common cooking tasks, such as boiling water, making roasts, and baking.  This exposed Mr. Stone to a health-harming concentration of pollutants, especially nitrogen dioxide.

52.     In addition, Mr. Stone was exposed to an even higher concentration of indoor pollutants because he almost always used the gas stove with the windows closed.  He was also exposed to a higher concentration of indoor pollutants when he used the gas stove for longer periods.  Approximately twice a week, he used the gas stove for two

16

to three hours at a time to cook a roast or to bake.

53.     Mr. Stone only discovered the truth in or around fall 2022, when he saw online news articles of the risks of harmful pollutants from gas stoves.  Mr. Stone could not have made the discovery earlier despite reasonable diligence.  Reasonable consumers do not conduct independent research on potential defects of consumer products.  Mr. Stone did not regularly read sources that would have shown the gas stoves' emissions defect earlier, such as epidemiology journals or World Health Organization guidelines.  Instead, it was only after there was widespread media coverage of the issue, that Mr. Stone discovered the truth.  Prior to this date, Mr. Stone was unaware of the defect and these risks.  Before this, Mr. Stone had no reason to search for information on a defect that he did not know about.

54.     Plaintiffs purchased Defendant's Products on the assumption that using the Product would not expose them to a significant air pollutant risk. Plaintiffs would not have purchased Defendant's Products had they known that it emitted harmful pollutants like nitrogen oxide.

55.     As a result, Plaintiffs suffered injury in fact when they: (a) spent money to purchase a Product they would not otherwise have purchased absent Defendant's misconduct; (b) overpaid for the Product due to Defendant's misconduct; and (c) paid for a defective product that, in truth, is worth less than he paid for it.

56.     Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiffs like Defendant's Products, and would purchase Defendant's Products in the future if the Products were redesigned to avoid emitting harmful pollutants. They face an imminent risk of harm, however, because they cannot rely on representations that the Products are safe for cooking inside the home or the absence of any pollutant warning. Absent injunctive relief, Defendant may continue to advertise, promote, and sell the Products while representing that it is safe, and without warning the public about the health risks.

**G.     No adequate remedy at law.**

57.     Plaintiffs seek damages and, in the alternative, restitution.  Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law.

58.     A legal remedy is not adequate if it is not as certain as an equitable remedy. To obtain a full refund as damages, Plaintiffs must show that the Product they received has essentially no market value. In contrast, Plaintiffs can seek restitution without making this showing. This is because Plaintiffs purchased a Product that they would not otherwise have purchased, but for Defendant's omissions.  Obtaining a full refund at law is less certain that obtaining a refund in equity.

59.     In addition, the elements of Plaintiffs' equitable claims are different and do not require the same showings as Plaintiffs' legal claims.  For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement for damages.  No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, rather than restitution, the legal remedies are more uncertain.

60.     Finally, the remedies at law available to Plaintiffs are not equally prompt or otherwise efficient.  The need to schedule a jury trial may result in delay.  And a jury trial will take longer, and be more expensive, than a bench trial.

**V.     Class Action Allegations.**

61.     Plaintiffs bring certain claims on behalf of the proposed class of:

- Nationwide Class: all persons who purchased Defendant's Products while living in the United States during the applicable statute of limitations;

- California Subclass: all persons who, while living in the state of California, purchased Defendant's Products during the applicable statute of limitations; and

- Consumer Protection Subclass: all persons who, while living in certain identified states (the "Consumer Protection Subclass States"), purchased

Defendant's Products during the applicable statute of limitations.

62.     The Consumer Protection Subclass States are as follows: California, Connecticut, Illinois, Maryland, Missouri, and New York.

63.     The following people are excluded from the proposed Class and Subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

64.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

### Numerosity & Ascertainability.

65.     The proposed class contains members so numerous that separate joinder of each member is impractical.  There are tens or hundreds of thousands of class members. The precise number of class members are unknown to Plaintiffs at this time.

66.     Members of the proposed class can be identified through public notice.

### Predominance of Common Questions.

67.     There are questions of law and fact common to the proposed class. Common questions of law and fact include, without limitation:

(1) Whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(2) Whether Defendant's conduct was unfair and/or deceptive;

(3) Whether Defendant breached an implied warranty;

19

(4) What damages are needed to compensate Plaintiffs and the proposed class; and

(5) Whether an injunction is necessary to prevent Defendant from continuing to deceptively market and sell the Products.

### *Typicality & Adequacy.*

68.     Plaintiffs' claims are typical of the other class members' claims.  Like other class members, Plaintiffs purchased Defendant's Products.

69.     The interests of the members of the proposed class and subclasses will be adequately protected by Plaintiffs and their counsel. Plaintiffs' interests are aligned with, and do not conflict with, the interests of the members of the proposed class or subclasses that they seek to represent. Moreover, Plaintiffs have retained experienced and competent counsel to prosecute the class and subclasses' claims.

### *Superiority.*

70.     The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that the same product is found unfit for its ordinary use for some proposed class members, but not for others.

71.     Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from certain central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of thousands of individual claims in separate lawsuits, every one of which would present the issues

1    presented in this lawsuit.

2    **VI.    Claims.**

3    <u>**Count I: Violation of California's Unfair Competition Law**</u>

4    **(on behalf of Plaintiffs and the California Subclass)**

5    73.    Plaintiffs incorporate by reference and re-allege each and every allegation

6    set forth above as though fully set forth herein.

7    74.    Plaintiffs bring this cause of action on behalf of themselves and members

8    of the California Subclass.

9    75.    Defendant has violated California's Unfair Competition Law (UCL) by

10   engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the three

11   prongs of the UCL).

12   *The Unlawful Prong*

13   76.    As alleged in detail above and below, Defendant engaged in unlawful

14   conduct by violating the CLRA, FAL, and Song-Beverly Consumer Warranty Act, as

15   incorporated here.

16   *The Fraudulent Prong*

17   77.    As alleged in detail above, Defendant's representations and omissions

18   concerning the product's defect were misleading.  Defendant's representations and

19   omissions were likely to deceive, and did deceive, Plaintiffs and reasonable consumers.

20   *The Unfair Prong*

21   78.    Defendant violated established public policy by violating the CLRA, the

22   FAL, and the Song-Beverly Consumer Warranty Act, as alleged below and incorporated

23   here.  The unfairness of this practice is tethered to a legislatively declared policy (that of

24   the CLRA, FAL, and the Song-Beverly Consumer Warranty Act).

25   79.    Defendant's conduct caused substantial injury to Plaintiffs and Subclass

26   members.  The harm to Plaintiffs and the Subclass greatly outweighs the public utility of

27   Defendant's conduct (which is none).  Defendant distributed household appliances that

28   emit harmful pollutants, when reasonable alternative designs exist.  Defendant also

omitted any warning about these pollutants.  These actions do not have public utility.  This injury was not outweighed by any countervailing benefits to consumers or competition.

80.     Plaintiffs and the Subclass could not have reasonably avoided this injury.  As alleged above, Defendant's representations and omissions were deceptive to reasonable consumers.

81.     Defendant's conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

82.     Defendant's conduct violated the public policy against misleading product labels and defective products, which is tethered to the CLRA and FAL, as well as the Song-Beverly Consumer Warranty Act.

* * *

83.     For all prongs, Plaintiffs saw and reasonably relied on Defendant's misleading representations and omissions when purchasing the Product.

84.     Defendant sold its Products specifically for cooking inside the home, while omitting any warning of the serious safety defect regarding harmful emissions.  Defendant knew of the defect, but actively concealed it.  Defendant should have, but did not, warn consumers of the risk of harmful pollutants while cooking.  This warning could have been included on the packaging for the product, or on stickers on the product itself.  But Defendant did not include any such warning.

85.     As alleged in detail above, Defendant had a duty to warn of this defect.

86.     As alleged in detail above, Defendant's misleading representations and omissions were material.  The defect would have been important to the purchase of Plaintiffs and other reasonable consumers.  Subclass-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Defendant's Products. Defendant's misleading representations and omissions were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of class members.

87.     Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because: (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendant's misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

### Count II: Violation of California's False Advertising Law (FAL)
### (on behalf of Plaintiffs and the California Subclass)

88.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in Sections I-IV as though fully set forth herein.

89.     Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

90.     As alleged more fully above, Defendant has falsely advertised its Products by making misleading representations and omissions.  Defendant sold its Products for cooking inside the home, and omitted any warning that the Products emit harmful pollutants.  For example, it markets the Samsung Products for residential use by consumers inside the house, while failing to warn that it emits harmful pollutants when consumers cook with it.  The representations and omissions are misleading because the Products emit health-harming pollutants.  Defendant knew of this defect, but failed to include any warning about the defect. Plaintiffs relied on these representations and omissions.

91.     As alleged more fully above, Defendant's representations and omissions were likely to deceive, and did deceive, Plaintiffs and reasonable consumers.  Defendant knew, or reasonably should have known, that its representations and omissions were misleading.

92.     As alleged in detail above, Defendant's misrepresentations and omissions were material.  Thus, subclass-wide reliance can be inferred.

93.     As alleged in detail above, Defendant's representations and omissions were

23

a substantial factor and proximate cause in causing damages and losses to Plaintiffs and subclass members.

94.     Plaintiffs and subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendant's misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

## Count III: Violation of California's Consumer Legal Remedies Act (CLRA)
## (on behalf of Plaintiffs and the California Subclass)

95.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in Sections I-IV as though fully set forth herein.

96.     Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

97.     Plaintiffs and the other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d).

98.     Plaintiffs, the other members of the California Subclass, and Defendant have engaged in "transactions," as that term is defined by California Civil Code §1761(e).

99.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

100.    As alleged more fully above, Defendant has violated the CLRA by advertising its Products in a way that is misleading or is likely to deceive consumers. Defendant failed to warn that its Products, which are sold for use in the home, emit health-harming pollutants. Defendant has also violated the CLRA by failing to warn of a material defect with the product.

101.    As a result of engaging in such conduct, Defendant has violated California

24

Civil Code §§ 1770(a)(2), (a)(5), (a)(7), and (a)(9).

102.   As alleged more fully above, Defendant's conduct was likely to deceive, and did deceive, Plaintiffs and reasonable consumers.  Defendant knew that its Products emitted harmful pollutants.  Defendant's failure to warn consumers that the Products emit harmful pollutants was deceptive.

103.   Plaintiffs saw and reasonably relied on Defendant's misleading representations and omissions when purchasing the Products.

104.   As alleged in detail above, Defendant had a duty to warn of this defect.

105.   As alleged in detail above, Defendant's misleading representations and omissions were material.  Thus, subclass-wide reliance can be inferred.  Defendant's misleading representations and omissions were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of subclass members.

106.   Plaintiffs and subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendant's misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

107.   Accordingly, pursuant to California Civil Code § 1780(a)(2), Plaintiffs, on behalf of themselves and all other members of the California Subclass, seek injunctive relief.

108.   CLRA § 1782 NOTICE.  On June 12, 2023, Mr. Stone mailed a notice letter to Samsung at its Ridgefield Park, New Jersey headquarters.  This letter provided notice of Defendant's violation of the CLRA and demanded that Defendant correct the unlawful, unfair, false and/or deceptive practices alleged here.  On June 29, 2023, Ms. Norris mailed a notice letter to Samsung at its Ridgefield Park, New Jersey headquarters. But because thirty days have not yet passed since Ms. Norris sent her CLRA demand letter, out of an abundance of caution, Plaintiffs do not yet seek CLRA damages (even

25

though Defendant received actual notice of the violations at least 30 days ago, because Mr. Stone sent them an earlier CLRA demand letter which satisfied this requirement). Plaintiffs intend to amend the complaint to seek all CLRA damages available once 30 days have passed since the last CLRA letter. For now, Plaintiffs seek only injunctive relief under the CLRA. If Defendant does not fully correct the problem for Plaintiffs and for each member of the California Subclass within 30 days of receipt of the second letter, Plaintiffs and the California Subclass will seek all monetary relief allowed under the CLRA.

**Count IV: Breach of Implied Warranty**

**Pursuant to Song-Beverly Consumer Warranty Act**

**(on behalf of Plaintiffs and the California Subclass)**

109.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in Sections I-IV as though fully set forth herein.

110.   Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

111.   Plaintiffs are "buyers" within the meaning of Cal. Civ. Code §1791(b).

112.   Defendant's Products are "consumer goods" within the meaning of Cal. Civ. Code §1791(a).  Defendant's Products are for use inside of the house.

113.   Defendant is the "manufacturer" of Defendant's Products within the meaning of Cal. Civ. Code §1791(j). Defendant is in the business of manufacturing or distributing Defendant's Products.

114.   As alleged in detail above, Defendant is aware that the consumers purchase its Products for the purpose of cooking in the home.  Consumers, including the California Subclass, rely on the skill and judgment of Defendant as a supplier of home appliances when selecting products suitable for home use. Defendant knew that Plaintiffs and class members would justifiably rely on Defendant's particular skill and knowledge of home appliances in selecting or furnishing products suitable for home cooking.  But the Products were not fit for the purpose.

115.   Defendant impliedly warranted that Defendant's Products were in merchantable condition and fit for the ordinary purpose for which the Products are used (cooking inside the home) under Cal. Civ. Code §§ 1791.1(a) & 1792.

116.   As alleged in detail above, Defendant's Products did not have the quality that a buyer would reasonably accept, and therefore were not merchantable.

117.   As alleged in detail above, Defendant's Products would not pass without objection in the home appliances trade because they emit harmful pollutants, and fail to warn of these risks.

118.   As alleged in detail above, Defendant's Products are not adequately labeled because they fail to disclose the risk of harmful pollutants.

119.   Defendant breached the implied warranty of merchantability and fitness by selling its Products containing defects.  These defects have deprived Plaintiffs and the Subclass of the benefit of the bargain, and have caused the Products to depreciate in value.

120.   Plaintiffs and subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Product if they had known of the defect, (b) they overpaid for the product because the product is sold at a price premium due to Defendant's misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

121.   Plaintiffs and Subclass members are entitled to damages and other legal and equitable relief, costs, and attorneys' fees.

**Count V: Violations of State Consumer Protection Statutes**

**(on behalf of Plaintiffs and the Consumer Protection Subclass)**

122.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in Sections I-IV as though fully set forth herein.

123.    This count is brought on behalf of Plaintiffs and the Consumer Protection Subclass for violations of the following state consumer protection statutes:

| State | Statute |
|-------|---------|
| California | Cal. Bus. & Prof. Code § 17200, and the following; *Id.* §17500, and the following; Cal. Civ. Code §1750 and the following. |
| Connecticut | Conn. Gen Stat. Ann. § 42- 110, and the following. |
| Illinois | 815 ILCS § 501/1, and the following. |
| Maryland | Md. Code Ann. Com. Law, § 13-301, and the following. |
| Missouri | Mo. Rev. Stat. § 407, and the following. |
| New York | N.Y. Gen. Bus. Law § 349, and the following. |

124.    Each of these consumer protection statutes prohibits unfair, unconscionable, and/or deceptive acts or practices in the course of trade or commerce or in connection with the sales of goods or services to consumers.

125.    As alleged in detail above, Defendant's conduct, including the marketing and sale of its Products to consumers, violates each statute's prohibitions.

126.    As further alleged above, Defendant's misrepresentations and omissions were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of Subclass members.  Defendant's misrepresentations and omissions were misleading to a reasonable consumer, and Plaintiffs and Subclass members reasonably relied on Defendant's misrepresentations.

127.    Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Defendant's Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and thus less

valuable than what they paid for.

128.    In this way, Plaintiffs and the members of the proposed Subclass have suffered an ascertainable loss, in an amount to be determined at trial.

### Count VI: Breach of Implied Warranties

### (on behalf of Plaintiffs and the Nationwide Class)

129.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above in Sections I-IV as though fully set forth herein.

130.    Plaintiffs bring this count individually and for the Nationwide Class.  In the alternative, Plaintiffs bring this cause of action on behalf of themselves and the California Subclass.

### *Implied Warranty of Merchantability*

131.    The Uniform Commercial Code § 2-314 states that "a warranty that [] goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." "Merchantable" goods must be "fit for the ordinary purposes for which the goods are used."

132.    Defendant is and was, at all relevant times, a merchant with respect to home appliances, and with respect to residential Products in particular.  Defendant's Products each constitutes a "good" under the UCC.

133.    Plaintiffs and class members purchased Defendant's Products.

134.    As the manufacturer of residential gas stoves, Defendant impliedly warranted to Plaintiffs and the class that the products were of merchantable quality and were safe for their ordinary use in home cooking.  In fact, as described in detail above, the products, when sold and at all times after, were not in merchantable condition and were not fit for the ordinary purpose for which they are used.  Specifically, the Products are inherently flawed given a defect in design making them emit health-harming pollutants when used to cook inside the home.  The defective design makes them unfit for ordinary purposes even when used correctly.  In addition, Defendant's Products are not adequately labeled because they fail to disclose the risk of harmful pollutants.

29

135.   Thus, Defendant breached the implied warranty of merchantability in connection with the sale and distribution of the Products.

136.   Plaintiffs and the class were foreseeable third-party beneficiaries of Defendant's sale of the Products.  Defendant sells the Products to retailers for distribution and sale to consumers such as Plaintiffs and class members.

137.   Defendant's breach directly caused Plaintiffs and class members' harm. Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Defendant's Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, or and/or (c) they received a product that was defective and thus less valuable than what they paid for.

### Implied Warranty of Fitness

138.   The Uniform Commercial Code § 2-315 states that where a seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

139.   Plaintiffs and class members purchased Defendant's Products for the particular purpose of cooking inside the home.

140.   As explained in detail above, Defendant knew, or had reason to know, that Plaintiffs and class members were purchasing the Products for the particular purpose of cooking inside the home.

141.   Defendant markets itself as a knowledgeable and effective developer and purveyor of home appliances, such as gas stoves and cooktops.

142.   As explained more fully above, Defendant knew, or had reason to know, that Plaintiffs and class members would justifiably rely on Defendant's particular skill and knowledge of home appliances in selecting or furnishing products suitable for home

1 | use.

2 |     143.   Plaintiffs and class members did justifiably rely on Defendant's judgment

3 | and skill.

4 |     144.   Due to the defect in the Products, the Products are not suitable for their

5 | intended purpose.

6 |     145.   As a result of the breach, Plaintiffs and the class suffered economic harm

7 | and damage.  Plaintiffs and Subclass members were injured as a direct and proximate

8 | result of Defendant's conduct because (a) they would not have purchased the

9 | Defendant's Products if they had known the truth, (b) they overpaid for the Products

10 | because the Products are sold at a price premium due to the misrepresentation and

11 | omissions, or and/or (c) they received a product that was defective and thus less

12 | valuable than what they paid for.

### Count VII: Fraudulent Omission

### (on behalf of Plaintiffs and the Nationwide Class)

    146.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

    147.   Plaintiffs bring this count individually and for the Nationwide Class.  In the alternative, Plaintiffs bring this cause of action on behalf of themselves and the California Subclass.

    148.   As alleged in detail above, Defendant made materially misleading omissions concerning the safety of its Products.  Defendant concealed information about the harmful pollutants emitted by its Products.

    149.   In deciding to purchase consumable products from Defendant, Plaintiffs and the class reasonably relied on Defendant's omissions to form the mistaken belief that the Products did not pose a significant pollutant risk.

    150.   As alleged in detail above, Defendant's fraudulent conduct was knowing and intentional.  The omissions made by Defendant were intended to induce and actually induced Plaintiffs and class members to purchase the Products.  Plaintiffs would not

have purchased the products had they known of the defect.  Class-wide reliance can be inferred because Defendant's omissions were material, i.e., a reasonable consumer would consider them important to their purchase decision.

151.    As alleged in detail above, Defendant had a duty to disclose the defect.

152.    Plaintiffs and class members were injured as a direct and proximate result of Defendant's fraudulent omissions because (a) they would not have purchased the product if they had known the truth; (b) they overpaid for the product because it is sold at a price premium due to Defendant's misleading representations and omissions, or (c) they received a product that was defective and thus less valuable than what they paid for.

153.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Defendant.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### Count VIII: Unjust Enrichment / Quasi-contract
### (on behalf of Plaintiffs and the Nationwide Class)

154.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

155.    Plaintiffs bring this count individually and for the Nationwide Class under California law.  In the alternative, Plaintiffs bring this cause of action on behalf of themselves and the California Subclass under California law, and those of absent class members under the laws of the state where they purchased the Products.

156.    Plaintiffs and class members conferred a tangible and material economic benefit upon Defendant by purchasing the Products.

157.    In exchange for the purchase price, Defendant provided a defective product, without a reasonable warning. Defendant knew and appreciated the benefit they incurred from consumers purchasing Products.

158.    Thus, Defendant is aware of, and has retained, the unjust benefit conferred

32

upon them by Plaintiffs and the class members.

159. Defendant received a direct and unjust benefit, at the Plaintiffs' expense.

160. Plaintiffs and the class seek restitution.

## VII. Jury Demand.

161. Plaintiffs demand a jury trial on all issues so triable.

## VIII. Prayer for Relief.

162. Plaintiffs seek the following relief individually and for the proposed class and subclasses:

- An order certifying the asserted claims, or issues raised, as a class action;
- An order appointing Plaintiffs as representatives for the Nationwide Class and each Subclass, and appointing their counsel as lead counsel for the classes;
- A judgment in favor of Plaintiffs and the proposed classes;
- An order requiring Defendant to stop selling its defective, unsafe Products without warning of the defect;
- Damages, treble damages, statutory damages, and punitive damages where applicable;
- Restitution;
- Disgorgement, and other just relief;
- An order awarding Plaintiffs and all other class members damages in an amount to be determined at trial for the wrongful acts of Defendant;
- Pre- and post-judgment interest on all amounts awarded;
- Injunctive relief as pleaded or as the Court may deem proper;
- Reasonable attorneys' fees and costs, as allowed by law;
- Punitive damages; and
- Any additional relief that the Court deems reasonable and just.

Dated: July 28, 2023          Respectfully submitted,

                              By: /s/ *Christin Cho*

                              Christin Cho (Cal Bar No. 238173)
                              christin@dovel.com
                              Simon Franzini (Cal. Bar No. 287631)
                              simon@dovel.com
                              Jonas B. Jacobson (Cal. Bar No. 269912)
                              jonas@dovel.com
                              DOVEL & LUNER, LLP
                              201 Santa Monica Blvd., Suite 600
                              Santa Monica, California 90401
                              Telephone: (310) 656-7066
                              Facsimile: (310) 656-7069

                              *Attorneys for Plaintiffs*

34